## The Judges of the Oneida Common Pleas *vs.* The People,    [79]
### *ex relatione* Savage.

Where, in an action of *trover*, there was a recovery in a court of common pleas for *less than fifty dollars,* and the common pleas made an order allowing the plaintiff *full costs* upon the ground *that the title to land had come in question upon the trial of the cause,* and the supreme court, upon the coming in of the return to an alternative mandamus, adjudged that *the title to land had not come in question* upon trial of the cause, and accordingly awarded a *peremptory mandamus* to the common pleas, directing a vacatur of the order for full costs ; *it was held,* in the court for the correction of errors, on a writ of error sued out, that the supreme court had no jurisdiction by *mandamus* to review the decision of the common pleas that the title to land had come in question on the trial of the cause.

The nature of the writ of *mandamus,* and the power of the supreme court in reference to it, considered and discussed ; and various cases upon the subject reviewed and commented upon.

Error from the supreme court. An action of *trover,* for the conversion of fourteen saw-logs, was brought in the Oneida common pleas by *Esther Sanford* against *Eli Savage.* The defendant pleaded the *general issue.* On the trial of the cause, the plaintiff proved that the logs belonged to her, and that they were delivered to the defendant at his *saw-mill* by a servant of *Charles O. Sanford* (a son of the plaintiff), for the purpose of being sawed into boards. A demand, and refusal to account for the logs, were shown. There was no evidence that *previous* to such demand, the defendant had any knowledge that the logs belonged to the plaintiff ; and the defendant proved by a witness called by him, that *Charles O. Sanford* sold the logs to him, and gave evidence to show that *Charles* was the general agent of his mother, from which fact the defendant argued that Charles was authorized to sell the logs. The plaintiff proved that the logs in question were cut upon land which had been assigned to her, by parol by her children, as *dower* in the lands whereof her husband died seized. Her title to the premises, upon which the logs were cut, was not controverted on

The Judges of the Oneida Common Pleas *v.* The People.

the trial. The jury found a verdict for the plaintiff with *four dollars* and *fifty cents* damages, and six cents costs. The common pleas, on the application of the plaintiff, made an order granting to her *costs,* upon the ground *that the title to land had come in question upon the trial of the cause.* The defendant applied to the supreme court for a *mandamus* directing the common pleas to vacate the order for costs, and an *alternative mandamus* was allowed, to which the common pleas made a return setting forth the above facts. The relator *demurred* to the return, a joinder was put in, and the demurrer was argued in the supreme court, where the return was adjudged insufficient, and judgment given awarding a *peremptory mandamus.* The plaintiff below sued out a writ of error in the name of the judges of the Oneida common pleas as plaintiffs in error, removing the record into this court.

The following opinion was delivered in the supreme court on the granting of the peremptory mandamus :

" *By the Court,* Nelson, Ch. J. 1. The title to land did not come in question. The logs were received by the defendant below from C. O. Sanford, the son and agent of the plaintiff, and he afterwards converted them to his own use. It was not necessary for the plaintiff to show any title to the land from which they were taken. The taking them to the mill of the defendant to be sawed, and the demand and refusal, were sufficient to entitle her to a recovery. All the evidence about her title to the land from which the logs were taken was wholly unimportant. The defendant did not undertake to controvert it. After the plaintiff's right to the logs was shown, by proving she sent them to the mill by her agent, if the defendant had undertaken to sustain his *purchase* from the son, by showing that he had title to the land from which they were cut, it is possible the plaintiff might have been driven to bring out her title by way of repelling that set up against her. By showing that the son who sold them was one of the heirs to the lot, and had a right to cut them as a tenant in common, the widow might have been under the necessity of showing the assignment of the premises to her for her dower ; and then it might be said the *title* came in question. But this proof as to the *title* being altogether immaterial in the first instance, and which could become material only by way of answer to the defence, could not be volunteered with a view to costs. It was not in the power of the defendant to compel the plaintiff to prove her title to the land in the first instance, as in the case of *Hubbell* v. *Rochester* (7 *Cowen,* 115). Her right to the logs was shown independently of it.

Again ; the *possession* of the plaintiff, from 1826 down to the commencement of the suit in 1835, was enough without shewing her title to the premises. Peremptory mandamus granted."

The cause was argued in this court by

*H. P. Hastings,* for plaintiffs in error.

*S. Stevens,* for the defendants in error.

*Points insisted on in behalf of plaintiffs in error :*

I. The supreme court erred in awarding a peremptory mandamus, because the alternative mandamus did not state that the judgment record in the common pleas was made up with a suggestion in it that the title to land came in question on the trial ; or in other words, that it was so made up, that there was no remedy by writ of error. (10 *Wendell,* 25. 3 *Barn. & Ald.* 222. 2 *Johns. Cas.* 72. 1 *Cowen,* 417.)

II. They also erred in awarding a peremptory mandamus commanding the defendants to set aside the judgment, and award costs to the defendant, which was not commanded in and by the alternative mandamus. (*Strange,* 879. 10 *Wendell,* 25. 12 *Petersdorf,* 512. 5 *Dowl. & Ryl.* 434. 3 *Barn. & Cres.* 545. 2 *Smith,* 54.)

III. They also erred in awarding a mandamus to compel the defendants to vacate the rule by them made, granting costs to the plaintiff, because the title to

The Judges of the Oneida Common Pleas *v.* The People.

land did not come in question on the trial in the common pleas.  1 *R. L.* 345, § 7.   3 *Johns. R.* 450   8 *Cowen*, 115.   7 *Wendell*, 495.   1 *id.* 466.   2 *R. S.* 294.   14 *Wendell*, 293.   1 *id.* 299.

IV.  They also erred, because the supreme court have no jurisdiction, by [82] mandamus or otherwise, to control the common pleas in certifying, or refusing to certify, that the title to land came in question, or that a trespass was wilful and malicious, or that the plaintiff's demand was reduced by set-offs, or any other matter of fact, upon which the right of either party to costs depends. These are all matters of fact to be found by the court, and certified by them in their minutes, as the fact appears to them, and not as it shall be decided by another tribunal.   If they wilfully err, they are liable to an action or indictment; if they honestly err, it must be because the question is somewhat doubtful, and in such a case they ought to have a discretion without control.   1. That the statute makes a certificate conclusive.   2 *Arch. Pr.* 247, 8, 9.   *St.* 43 *Eliz. Ch.* 6.   *St.* 22 *and* 23 *Car.* 2, *ch.* 9.   8 *and* 9 *Wm.* 3*d, ch.* 11.   2 *R. S.* 1*st. ed.* 613, § 2.   *Id.* 653, § 8 : *Note of Revisers to this section.*   3 *East*, 495.   6 *Johns. R.* 277.   2 *Cains*, 220.   1 *Johns. R.* 405.   1 *Wendell*, 279.   1 *Wilson*, 93.   2. That the mandamus in its nature is not applicable to such a case.   *Comyn's Dig. Mandamus B.   Bacon's Abr. Man. A. D. E. and J.*   7 *T. R.* 467.   1 *East*, 306.   6 *T. R.* 170.   12 *Petersdorf*, 468, *and note and authorities there cited.   Id.* 498.   1 *Chitty's R.* 34.   2 *id.* 250.   4 *Barn. & Ald.* 298.   1 *Dowl. & Ryl.* 35.   2 *Chitty's R.* 257.   In our courts in favor of the principle I contend for.   2 *Johns. Cas.* 72.   1 *Cowen*, 417.   2 *Johns. R.* 317.   12 *id.* 414.   17 *id.* 259.   4 *Cowen*, 49.   6 *id.* 392.   7 *id.* 363.   10 *Wendell*, 545.   14 *id.* 68.   2 *Cowen*, 479.   11 *Johns. R.* 114.   16 *Wendell*, 370.   Contra : 1 *Cowen*, 15.   5 *Wendell*, 114.   10 *id.* 285.   12 *id.* 246.   13 *id.* 649.   See also, 2 *Binn.* 362 ; 3 *id.* 275 ; 5 *id.* 87 ; 10 *Pick. R.* 244 ; *N. Hamp. R. cited in Am. Com. Law tit. Mandamus* ; 3 *Dall.* 42 ; 9 *Peters*, 298, *et seq.   Opinion*, 602 ; 5 *id.* 216, *per Baldwin J.*   10 *id.* 286.   16 *Serg. Rawle*, 318.

### Points insisted on in behalf of defendants in error :

I.  The suit in the common pleas was a frivolous one for a small matter, which a justice of the peace might and should have heard and decided; he has, by statute, jurisdiction of such cases.   There was not the slightest neces- [83] sity for commencing it in the common pleas.   2 *R. S.* 225, § 2 *sub.* 2.

II.  It is a general and well settled rule in every case where costs are claimed upon the ground that the title to land came in question upon the trial, that this was necessarily the case, and that the plaintiff could not have recovered without it.   (2 *R. S.*, 613, § 3, *sub.* 2 ; *Hullock's Law of Costs, p.* 40 *to* 46, 64, *and note* (1) ;   *Id.*, 88 ;  7 *Wendell*, 495 ;  3 *Cowen*, 346 ;  9 *Id.*, 692, *S. C.* ;  10 *Wendell*, 555.)

III.  The possession of the land by the husband of Mrs. Sanford, prior to his death in 1825, enured to her benefit, so far as concerned her portion assigned as dower, and authorized a recovery by her for the logs, simply on the ground of possession.   The dower estate is a mere continuance of the estate of the husband.  No resort to any other than a justice's court was therefore necessary, as the justice may try causes for trespass upon land founded upon possession, where title is not pleaded.   (2 *R. S.*, 225, § 2. *sub.* 2.)

IV.  So her own possession of the land was abundantly sufficient for the same purpose.   Her possession immediately succeeded her husband's, was uninterrupted and undisputed, and she actually pastured the premises some time.   This was a small lot, a part of which was enclosed, and she had an actual possession of the whole for every purpose.   (3 *Cowen*, 346 ; 9 *Id.*, 692, *S. C.* ; 2 *R. S.*, 294, § 10 ; 4 *Cowen*, 531 ;  8 *Id.*, 115 ;  7 *Wendell*, 493 ; 14 *Id.*, 239 ; 4 *Taunton*, 547.)

V.  So she could have recovered in a justice's or any other court of law, upon her *possessory right to the logs*, without any regard to the land or the place from

whence the logs came. The action (trover) is a possessory one, and mere possession against a wrong doer is enough in this action as well as in trespass. The logs were cut, and by her direction taken by her agent to the mill, and marked with his and her name. This gave her the possession of them, even if it should be conceded that she had no right to cut them, and she could upon this ground alone have maintained trover against any wrong doer. (*Starkie's Ev., pt.* [84]  3, *p.* 1488, 90, *and note*, (*r.*); 2 *Strange*, 777; *Woadsen* v. *Nawton, Cro. Eliz.*, 819; *Basset* v. *Maynard*, 1 *Wendell*, 466; 1 *Moore & Scott*, 452; 2 *Wils.*, 23; 3 *Id.*, 332.)

After advisement, the following opinions were delivered:

*By the* CHANCELLOR.—The first and second points of the plaintiffs in error, which relate to matters of form merely, and which were never before the court below in such a manner as to enable that court to pass upon the questions attempted to be raised thereon here, were properly disposed of upon the argument, and are therefore not entitled to further consideration.

The next question is, whether the court below was right in supposing that it appeared from the return of the plaintiffs in error that the title to land did not come in question upon the trial of the cause before the common pleas. That the plaintiff in that suit did in fact give in evidence her title to the premises, where the logs were cut, as tenant thereof in dower, is beyond all dispute. The deed to her husband was not the title, if any, which was in question there, as both parties claimed under the same title in that respect; the plaintiff, as tenant in dower of the lands embraced in the deed, and the defendant as a purchaser of the logs from the son, who was one of the heirs at law of the husband. All that was necessary to enable her to establish a right to the logs was to show her husband in possession at the time of his death, and that this particular part of the property had been assigned to her for her dower, by her son and the other heirs, previous to the time when the logs were cut. The only use of the deed was to show the extent of her husband's constructive possession, arising from his actual possession of a part of the premises under that deed. (*Jackson* v. *Vermilyea*, 6 *Cowen's R.*, 677.) This deed, therefore, was not evidence of the plaintiff's title; but it was a link in the chain, to show the husband's seizin or possession, for the purpose of connecting the assignment of the dower with such possession of the lands; as the only question which could be material was, whether he died [85]  in possession of the land, and that the same was assigned to her by the heirs, as and for her dower. And having showed his possession, by the proof of actual possession of a part of the premises, under this deed for the whole, the plaintiff proved a perfect title to the lands upon which the logs were cut, in herself for life, as tenant in dower, not only as against her son, but also as against the defendant who claimed the logs under him, by showing the assignment of these premises to her, as and for her dower, by the son and other heirs of the husband.

In the case of *Hubbell* v. *Rochester*, (8 *Cowen's R.* 115,) which was an action for cutting timber upon a lot wholly wild and uncultivated, I thought it my duty to certify that the title to the land came in question, as there was no actual possession of any part of the lot; and because the only possible way in which the plaintiff could recover for the cutting the timber thereon, was by showing a regular title to himself from the original patentee, so as to show himself in possession in contemplation of law, from the fact that he was the owner of the land. Whether it was possible in the present case for the plaintiff in the suit in the common pleas to show the logs to be hers, in any other way than by showing the possession of the husband and the assignment of dower to herself, so as to give her the benefit of a constructive possession by virtue of her legal right, is a question which I am not prepared to answer from the facts stated in this return. If she could not, then it is certain her title to the land was in question, according to my decision at the circuit, in the case of *Hubbell* v. *Rochester*, and which was after-

The Judges of the Oneida Common Pleas *v*. The People.

wards confirmed by the supreme court. Proof of her possession of the part of the fourteen acre lot which was inclosed, did not prove her in the constructive possession of the wild and uncultivated part of the same lot, without showing that her entry upon the part of the lot of which she was in actual possession was under claim or color of title which extended to the whole. In *Buck* v. *Aikin*, (1 *Wendell*, 466,) the supreme court very correctly decided that where a party was in possession of a part of a lot, without showing he was in under a claim of title which extended to the whole, he was not to be deemed construc-  [86] tively in possession of the wild and uninclosed part of the same lot, so as to entitle him presumptively to the timber cut there. This decision was also in accordance with the provisions of the Revised Statutes on the subject of the constructive possession of lands. (2 *R. S.* 294, § 10, 11.) If in the present case the widow was in the actual possession of the inclosed part of the lot, a constructive possession could have been shown to the residue of the lot by showing her entry under a claim to the whole, founded upon the written conveyance to her husband for the lot in his lifetime, and the subsequent assignment of the whole lot to her by the heirs as a part of her dower in the lands of which she died possessed. This, perhaps, would not be considered as a dispute about the title, but merely a question of possession ; as the regularity or legality of the assignment would not be drawn in question. But if the son was in possession of the inclosed part of the lot, or if it was doubtful whether he or his mother were in possession, the legality of her title under the assignment to the whole lot must come in question, to enable her to prove a possession of the part of it where the logs were cut, by operation of law, arising from her legal ownership as the tenant in dower. It might have been urged, perhaps, that she did not show a legal title to the lot as tenant in dower, if a written assignment thereof was necessary, as the assignment in this case was by parol merely. But the rule of the common law on the subject appears to be, that neither a written assignment or actual livery of seizin is necessary to give the widow the title to her dower lands, where there has been an actual assignment of her dower by the heirs of the husband, or other tenants of the freehold, by agreement with her; that as she comes into her estate as tenant in dower, not by any title derived through the assignment, but by virtue of her marriage and the seizin and death of the husband, a parol assignment of dower is sufficient, as the only object of the assignment is to ascertain the part of the land upon which she is to enter under the title cast upon her by the death of the husband. (*Co. Litt.* 35, *a*. *Rowe* v. *Power*, 5 *Bos. & Pul.*  [87] *R.* 34. *Park on Dower*, 269.)

It will be seen from this statement of the case, that the question whether the title of the widow to the premises was material to be shown on the trial in the common pleas, was *a question of fact*, rather than a question of law arising from undisputed facts ; for it does not distinctly appear whether it was possible for the plaintiff to have proved her title to the logs, to the satisfaction of the jury, in any other way than by showing her title to the land. The character of her two main witnesses, it appears, was impeached, or attempted to be impeached ; and as the general issue in the cause put her whole right to the logs in question in issue, she was bound to prove that right by legal evidence, although the defendant said nothing about her right to the land; unless he affirmatively admitted her title before she had been compelled to establish it by the legal evidence. It appears to me, therefore, that there was no question of law involved in the decision of the court of common pleas ; and that whatever authority the supreme court may have to correct errors of this kind in mere matters of law, it was the intention of the legislature to make the court before whom the cause was tried, the sole judges whether the title to lands came in question, if the decision thereof depended upon disputed facts. The statute directs that the judge or judges of the court before whom the cause is tried, shall, upon application of either party, either before or after verdict rendered, cause an entry to be made in the minutes of the court,

The Judges of the Oneida Common Pleas v. The People.

specifying that such title came in question; which entry, or the certificate of the judges who tried the cause, shall be the only evidence received by the taxing officer of the fact. The conclusions which the judges draw upon the trial, when all the circumstances are fresh in their recollection, are certainly more to be relied on, as to a disputed fact, than any which can be drawn by others from a detailed state of the evidence and the arguments and exceptions of counsel, when incorporated into the written return to a mandamus.

[88] From the conclusion at which I have arrived upon the third point of the plaintiffs in error, it is not necessary to the decisions of this case that I should examine the question of jurisdiction raised by the fourth point; and I should prefer to delay a decision thereon until it could be more fully argued, on one side at least, than was done in the present cause. I must be permitted to say, however, that the mode of proceeding by mandamus, under the present statutory provisions on the subject, is a very inappropriate remedy to correct mere errors of judgment, either as to law or fact, in courts of general common law jurisdiction. The proceeding, according to the statute, is neither in form or substance a controversy between the parties in the court of common pleas; it purports to be, and is in fact a suit against the judges of that court, by one of the parties, to compel the defendants to reverse an erroneous decision which they may have made in perfect good faith; and to compel them to pay to the plaintiff, or relator, all the damages or costs he may have sustained in consequence of such erroneous proceeding, if it turns out that the supreme court or this court, upon a writ of error, thinks they have erred in judgment. And in the present record, although there is not the smallest room for doubt that the plaintiffs in error, in their judicial capacity, acted in perfect good faith in deciding what they at least supposed was consistent both with law and fact, they are charged with a little rising of fifty dollars costs, because, in the opinion of the supreme court, they happened to decide wrong. It is true the legislature has amended the statute which made it absolutely necessary for the supreme court to give judgment for costs against the parties to whom a peremptory mandamus was directed, and has left such costs in the discretion of that court. But the defendants in such cases, the judges of the inferior courts, are still liable to the relator for all damages he may sustain by reason of their neglect to comply with the alternative mandamus, although they may have returned facts thereon which they supposed were sufficient to justify them in point of law, for not reversing their former decision. And they are also liable to the costs of a writ of error to this court, if the supreme court decides in their favor, and this court happens to differ with the [89] supreme court on the question presented by the return. Without intending to express any opinion whatever upon the general question of jurisdiction, therefore, I shall vote for a reversal of the judgment of the supreme court, because I am not perfectly satisfied that the title to land did not necessarily come in question upon the trial in the court of common pleas. And at all events that it was a question of fact in this case, upon which the decision of the plaintiffs in error, when acting judicially, under the positive directions of a statute, should have been considered as conclusive.

By Senator TRACY. My mind was principally interested on the argument of this case, by the question whether the decision of the court of common pleas that the title to lands came in question on the trial of the cause, is not such a judicial decision by a court of competent jurisdiction for the purpose, that the supreme court could not, in the exercise of its legitimate functions, review it by a writ of mandamus. As the conclusion to which I have arrived on this point makes it unnecessary to decide or discuss the other points of the case, I shall confine my present remarks wholly to it.

Before entering into an examination of the nature and objects of the writ of mandamus, I will premise that I fully concur in the decisions made in the early history of the supreme court, and which since have been frequently reiterated,

The Judges of the Oneida Common Pleas *v.* The People.

that the constitution intends to confer upon it general supervisory powers over the inferior judicial tribunals of the state, and that its powers and jurisdiction in all cases not manifestly differing by reason of laws or institutions peculiar to the two countries, resemble and fully equal the powers and jurisdiction of the English court of King's bench. I concur, likewise, in the views expressed by Mr. Justice Kent, (2 *Caines' Cas. in Error,* 319,) that all courts within the several counties have from the first foundation of our judicial system been regarded by law and by practice as inferior courts, which may be compelled to duty by a mandamus, and restrained from usurpation by prohibition. I am, indeed, ready to admit the present justness of what was said by the supreme [90] court, (1 *Johns. Cas.;*) that " our courts of common pleas still retain almost every characteristic of inferior courts." But while I admit these views of the nature and character of our courts of common pleas to be correct, I shall endeavor to maintain that it has been always held, both in this country and England, that though courts may be in their general character inferior and subordinate, yet that they all possess some judicial powers which both for reason and general convenience must be regarded absolute ; at least so far that the exercise of these powers cannot fitly be made a subject of review by other tribunals. Accurately to prescribe these powers and to define their limits with certainty and precision, is an undertaking which, if in its nature it be accomplishable, is not within the scope of my present purpose to attempt. It will be sufficient for this case if I succeed in making it as clear to others as it appears to me, that the decision of the court of common pleas, which the supreme court by its mandamus has ordered to be reversed, was made in the exercise of a power which policy advises, necessity demands, and the law contemplates should be absolutely discretionary.

The Revised Statutes, (*2d vol. p.* 613, § 3,) among the cases where the plaintiff recovering damages shall recover full costs without regard to the amount of damages that may have been recovered, gives that in which the title to lands or tenements shall have been put in issue by the pleadings, or shall have come in question on the trial of the cause. Now whether the title to lands or tenements did come in question on the trial of a cause, is a matter of fact, the decision of which must necessarily be confined to some tribunal, and from the nature of the question it would seem to be properly confined only to that tribunal before which the trial was had. But it is said that the question whether the title to lands *necessarily* came in question, may be one of law as well as of fact, and if the absolute decision of it be left to a court of common pleas, a case may occur where rank injustice has been done by an erroneous decision, of which the party is remediless, unless a review of it can be obtained by mandamus. Without stopping to ascertain whether the true intention of the statute be, that [91] the title to lands must have come into question *necessarily* on the trial, to entitle the plaintiff to full costs, and conceding what it would be difficult to show, that if such be the case, the question would not then be one wholly of fact, it seems to me not at all to follow, that therefore a mandamus would lie to review the decision of the court.

It is not to be doubted that the use of the mandamus has been extended in modern times beyond the limits which in the early ages of our judicial history, were assigned to it, nor that this extended use has been on the whole of decided public benefit. But after carefully reviewing this subject, I am constrained to conclude that the supreme court of this state has in some instances inappropriately applied it, and there is reason for believing that the anxious pursuit of individual right, which has always distinguished that tribunal, is disposing it to apply the remedial aids of this writ, to an extent which, however it may promote the justice of particular cases, tends in some degree to disturb that distribution of judicial powers which our legal institutions contemplate and require.

The mandamus being in its nature what is termed a prerogative writ, issuing

only from the tribunal which represented judicially the king himself, was extended originally to matters rather of general and public concernment, than to such as affected only the rights of a particular subject : as to cases of some breach of the peace, disobedience of a law, or neglect of official duty; and, therefore, we are to construe rather as an extension than as a restraint of its original uses, what is given by *Comyn, tit. Mandamus, A.,* where he says, " the court of king's bench has power by mandamus to correct all extra-judicial errors which tend to the breach of the peace, oppression of 'the subject and other misgovernance." But long subsequently to Comyn, we find the court of king's bench, (3 *Burr.*, 1267,) remarking, that " within the last century, it has been liberally interposed for the benefit of the subject and the advancement of justice." This remark, however, is to be qualified by the contemporaneous observation of Lord Mansfield, [92] which he frequently repeated, " that it was a very beneficial writ, but that the best mode of preserving it, was to be sparing in the use of it." The good sense of this observation is sufficiently illustrated by the fact, that before this time, " the liberal interposition of it," had led to such uncertainty and con-fusion, in regard to its application, as to induce the remark, (4 *Bacon's Ab., Mandamus, C.,*) " that the cases in the books on this head are so unsettled and contradictory, that it is hardly possible to fix on any general rule whereby to determine in what instances the court of king's bench having a superintendency over all inferior courts and magistrates, will grant a mandamus or not."

The uncertainty, however, here referred to, as to the granting the writ by the king's bench, will be found, on examination, to arise from the character of the persons to whom the writ was to be directed and the objects sought to be accomplished, and not from the nature of the acts complained of. The broad distinction between a direction to an inferior tribunal *to act,* and direction to it *how to act,* seems to have been at all times well observed. Thus, we find it given in Bacon, that a mandamus will lie to compel a judgment to be rendered, but not what judgment to render ; to justices to receive and proceed upon a complaint, but not what decision to make; to compel the ordinary to grant letters testamentary, but not to what person. It has therefore been held not to lie to the sessions to compel them to admit an appeal in regard to poor rates, (4 *T. R.*, 488,) nor to commissioners of bankruptcy to certify the bankrupt's conformity to the act, (7 *East*, 92 ;) in both cases, the officers having a discretion. Nor does it lie to compel justices to come to a particular decision, nor to make an order of maintenance, nor to grant a license. (3 *Black. Comm.*, 110, *note.*) More recently, *Rex* v. *Justices of Droon,* (1 *Chitty's R.*, 34,) the court refused to compel a quarter sessions to enter continuances, saying, " Our powers are great, but they are not unlimited ; they are bounded by some lines of demarcation; we are not aware [93] that we have power to interfere with the court below in the way suggested." Again, *Exparte Morgan*, (2 *Chitty*, 250,) a mandamus was denied to compel a court of inferior jurisdiction to grant a new trial in a cause before it, where alleged injustice had been done to one of the parties, the court remarking, " We may command an inferior court to give judgment in a matter fit and proper for its cognizance, but we cannot interfere to regulate its practice, because every inferior court is the proper judge of its own practice." In the case of *The King* v. *The Justices of Middlesex*, (4 *Barn. & Ald.* 300,) Abbott, Ch. J. says : " There is not an instance can be cited where the court has granted a mandamus to justices to compel them to come to any particular decision."

In all the state courts of this country where the question has been agitated, except in our own state, the same distinction as to the proper functions of a mandamus seems to have been rigidly observed. In Pennsylvania, (*Commonwealth* v. *Judges of Com. Pleas of Philadelphia County,* 3 *Binney*, 273,) it was decided that a mandamus would not lie to the judges of the common pleas, to reinstate an appeal which they had dismissed, because a mandamus cannot go to an inferior court compelling them to make a particular decision, but merely to decide.

The Judges of the Oneida Common Pleas v. The People.

In *Griffith* v. *Cochran*, (5 *Binney*, 103,) Tilghman, Ch. J. says · " The principles which govern the court in issuing writs of mandamus, are well understood. Where a ministerial act is to be done, and there is no other specific remedy, a mandamus will be granted to do the act which is required. But where complaints are against a person who acts in a judicial or deliberative capacity, he may be ordered by mandamus to proceed to do his duty, by deciding and acting according to the best of his judgment; but the court will not direct him in what manner to proceed." And so rigidly was this distinction adhered to by the same court, that in *Commonwealth, ex. rel. Breckenridge*, v. *Judges of C. P. of Cumberland County*, (1 *Serg. & Rawle*, 187,) it refused a mandamus to compel a court of common pleas to proceed to examine a person applying to be admitted as an attorney, notwithstanding the supreme court was satisfied that he came within the rule of the common pleas. Their refusal was put on the ground that the admission of an attorney is not a ministerial but a judicial act, and therefore not the subject of the writ of mandamus.

In New-Jersey the same distinction has been recognized. *Seving* v. [94] *Inhabitants of Alloway's Creek*, (5 *Halstead*, 58,) where a mandamus was refused, on the principle, that " to officers a writ of mandamus may go to direct them how to proceed, and what to do; but a mandamus to a court only to direct them to proceed according to law, and not how to proceed."

So in Kentucky, (*The County Court of Warren* v. *Daniel*, 2 *Bibb*, 573,) it was decided that " a mandamus is a proper remedy to compel an inferior court to adjudicate upon a subject within its jurisdiction, where it neglects or refuses to do so; but where it has adjudicated, a mandamus will not lie for the purpose of revising or correcting its decision.

And in Massachusetts, (*Chase* v. *Blackstone Canal Co.*, 2 *Pick.* 244,) the court say : " This writ lies either to compel the performance of ministerial acts, or is addressed to subordinate judicial tribunals, requiring them to exercise their functions, and render some judgment in cases before them, when otherwise there would be a failure of justice from delay or refusal to act. But where a subordinate tribunal has acted in a judicial capacity, upon a question properly submitted to its judgment, a mandamus will not be granted to compel it to reverse its decision.

Analogous decisions may be found in the courts of New Hampshire, Virginia and Ohio, and probably have been made in several other states, inasmuch as we find at an early day an express decision on this point, made by that court, whose opinion has rarely failed to be of controlling authority for the state courts upon any important general principle. The decision to which I refer, is reported in *United States* v. *Lawrence*, (2 *Dallas*, 42,) where it was sought to compel a district judge to issue a warrant to arrest an alleged deserter from the French naval service, under a treaty stipulation, and in which it was the clear and unanimous decision of the court, that the district judge having acted judicially in deciding that the evidence was not sufficient to authorize his issuing a warrant, the supreme court, however it might differ in opinion from the judge as to the sufficiency of the proof, had no power to compel him to decide according to the dictates of any judgment but his own. And [95] the court there, as well as in the subsequent case, *Life & Fire Insurance Co. of N. Y.* v. *Adams* (9 *Peters*, 602), recognizes the principle contended for by the counsel in the first cited case, that a mandamus is founded on the idea of a default, as where an inferior court will not proceed to judgment, or a ministerial officer will not do an act which he ought to do; but is never issued to a judge who had proceeded to give judgment according to the best of his abilities. And in the case last cited, Chief Justice Marshall says : " On a mandamus a superior court will never direct in what manner the discretion of an inferior court shall be exercised, but will, in a proper case, require the inferior court to decide."

In this state also, notwithstanding the supreme court has, in some cases, I

think, carried the remedy by mandamus beyond its appropriate limits, it will be found that the true principles that should determine the use of the writ have been generally observed, and frequently explained and enforced. The first reported decision which, I believe, appears, is, *The People* v. *Sessions of Chenango* (1 *Johns. Cas.*, 179), where a mandamus was granted to compel a court of sessions to enter judgment on a verdict, on the ground that that court had not power to grant a new trial. This decision rests on the undoubted principle that it is the province of the supreme court to enforce obedience to the statutes, and oblige subordinate courts and magistrates to do those legal acts which it is their duty to do. Upon the same principle rest the decisions of *Fish* v. *Weatherwax* (2 *Johns. Cas.*, 215) ; *Haight* v. *Turner* (2 *Johns. R.*, 371) ; *Sikes* v. *Ransom* (6 *id.*, 279) ; *Horne* v. *Barney* (19 *id.*, 247). The principle of the decision in *The People* v. *Justices of Delaware Common Pleas* (1 *Johns. Cas.*, 181), is somewhat more doubtful. This is the case where a mandamus was granted to compel the judges of the court of common pleas to restore an attorney whom they had stricken from the roll, and the decision 'is utterly irreconcilable with that before cited from 1 *Serg. & Rawle*, 187, except it be placed wholly upon one of [96] the grounds stated by the court, " that it was established by a then act of the legislature, that if a court of common pleas remove an attorney from office, he could not be admitted to practice in the supreme court, though he should also be an attorney of that court." If, therefore, the supreme court could not revise the proceedings of the court of common pleas in that respect, they might disqualify an attorney of that court, and however unjust it might be, there would be no power in the supreme court to afford relief.

In the cases of *Wilson* v. *Supervisors of Albany*, (12 *Johns. R.*, 416) and *Ex parte Nelson* (1 *Cowen*, 423), the court refused the writ, on the ground that where a discretion is vested in any inferior jurisdiction, and that discretion has been exercised, a mandamus will not be granted, because the court cannot control, and ought not to coerce that discretion. The cases, *Ex parte Bacon & Lyon* (6 *Cowen*, 392), and *Ex parte Benson* (7 *id.*, 363), are on the same principle, as is also that of *Hull* v. *Supervisors of Albany* (19 *Johns. R.*, 259), in which the principle is definitely and accurately stated by the court, that, " where the inferior court has discretion, and proceeds to exercise it, this court has no jurisdiction to control that discretion by writ of mandamus. But if subordinate public agents refuse to act or to entertain the question for their discretion in cases where the law enjoins upon them to do the act required, this court may enforce obedience to the law by mandamus, where no other legal remedy exists."

It is not until the case of the *People* v. *Superior Court of New York* (5 *Wendell*, 114), that a manifest tendency is disclosed to extend jurisdiction by mandamus, over the judicial acts of an inferior court, which was acknowledgedly acting within the scope of its legitimate functions. For although the reporter's note to *Blunt* v. *Greenwood* (1 *Cowen*, 15), is, that " a mandamus lies to correct erroneous practice of a court of common pleas in mere matters of discretion ;" this proposition seems not to have been much considered by the court, and the case is scarcely authority for it. Besides, in the same volume (*post*, 423), the court say, " where a discretion is vested in any inferior jurisdiction, [97] and that discretion has been exercised, a mandamus will not lie." And the case *ex parte Bailey* (2 *Cowen*, 479), where the court, in refusing a mandamus to compel the court below to grant a new trial, intimate that in extreme cases it might interfere to control inferior courts upon questions of fact, is not to be deemed a direct assertion of such a power. But the case before alluded to (5 *Wendell*, 114), contains not only the assertion of this great, and, as I am compelled to regard it, novel power, but an elaborate and very ingenious defence of it, by one of the most able judges that has ever adorned the bench of this state. (*a*)

(*a*) See The People *v.* Judges of Dutchess, 20 Wend., 658.

The Judges of the Oneida Common Pleas *v.* The People.

This case was on an application for a mandamus to vacate a rule of the superior court of the city of New York, granting a new trial on the ground of newly discovered evidence. In granting the application, Mr. Justice Sutherland, who delivered the opinion of the court, advances the following propositions: 1. That a writ of mandamus lies where a party has a legal right, and no other appropriate remedy: 2. That it does not lie to an inferior tribunal, where such tribunal has the right of exercising its discretion. 3. That the discretion which the supreme court cannot control, is one governed by no fixed legal principles. 4. That in all cases where an inferior court is bound to proceed according to established legal principles, and it is alleged that an error has been committed, the court has power to issue a mandamus, and if error has intervened, the same obligation exists to issue the writ as to affirm or reverse a judgment upon a writ of error.

In the brief review of the foregoing propositions which, with feelings of unfeigned respect for the learned court that has sanctioned them, I shall now attempt to make, there will be occasion for me to express, unreservedly, my views of the qualifications that should be made of some of them, and my firm opinion, that when taken collectively, their direct tendency is to an erroneous general conclusion. The first proposition that a writ of mandamus lies where a party has a legal right, and has no other appropriate remedy, involves, perhaps, the whole subject of discussion, for it turns upon a point, the right definition of which, is really the whole matter in dispute. The question arises, [98] what is a *legal* right? If by a legal right is meant any abstract moral right which a party may succeed in persuading a judge exists, then the proposition is not correct. For it is not true that there are or can be rules of law so accurately defined and so perfectly adjusted, that their measure will be the precise measure of moral right in its individual application to each of all the infinitely varied relations of mankind. Nothing short of Omniscience could establish such rules: nothing less than Omnipotence could execute them. It is true that we receive and admit as a common maxim, that the law has a remedy for every wrong. But this we know means only a legal wrong, and therefore the proposition being turned round, comes to nothing more than that there is no wrong where there is no remedy; in another's words, " I have no wrong where I can claim no right," a proposition which, when applied to the moral, and often, indeed, as it can be, to the natural relations of man, is revoltingly absurd. But without any such ethical refinement of the proposition, it is not true, in the common acceptation of the terms. In *Wilson* v. *Supervisors of Albany,* (12 *Johns.* 414,) we find the court in refusing a mandamus to say, " It may be a hard case, and the party may be remediless, but that consideration cannot induce the court to grant an unfit remedy." And in *Rex* v. *Justices of Wilts,* (2 *Chitty,* 257,) where a mandamus was refused, Bailey, J., in reply to the counsel, that there was no other remedy, says: " There are many cases in which there is no other remedy against the sessions where we should not interfere." This proposition, then, of the learned judge, when properly qualified, seems to me to amount only to this, that when there is a legal remedy, and there is no other appropriate remedy but a mandamus, then a mandamus is the appropriate remedy. In this qualified form, the proposition is not only true but self-evident. But how far it will avail to justify a mandamus to the superior court of New York, to vacate a rule granting a new trial on the ground of newly discovered evidence, remains yet to be shown.

The second proposition, that a mandamus does not lie to an inferior [99] tribunal, in cases where such tribunal has the right of exercising its discretion, is an elementary proposition, coeval with the origin of the writ; and as I have endeavored to show, concurrent with its use, down to the very case in which it is re-stated by the learned judge. It is, indeed, the very proposition

The Judges of the Oneida Common Pleas *v.* The People.

on which rests my conclusion, that the allowing the writ in that case was erroneous.

The third proposition, that the discretion which cannot be controlled by mandamus is one governed by no fixed legal principles, is a proposition which, if used only to define the general nature of judicial discretion, is immaterial ; and if used for the purpose of predicating of it, that there is a judicial discretion which is to be exercised, not according to the judgment and conscience of the one in whom the law confides it, but according to the judgment and conscience of another in whom the law does not confide it, then I say the proposition is necessarily incorrect. What is to be understood by a discretion governed by no fixed legal principles, is perhaps sufficiently explained by the illustrations given in the opinion which is now attempted to be reviewed ; at any rate, it is abundantly exemplified by the numerous cases to which I have already referred. It means, when applied to public functionaries, a power or right conferred upon them by law, of acting officially in certain circumstances, according to the dictates of their own judgment and conscience, uncontrolled by the judgment or conscience of others. But what is to be understood by a discretion that is governed by fixed legal principles, is, I must be allowed to say, something that I have not found satisfactorily explained, and what it is not easy for me to comprehend. Poetry may be indulged the license of saying,

> " We have a power in ourselves to do it, but it is
> A power which we have no power to do."

But the same idea, when attempted to be gravely enforced as the basis of a judicial decision, seems too paradoxical to admit of our assent to it. As a matter of faith, we can assent to the theological dogma of " an overruled free agency," but in a matter of legal reasoning, we are justified in asking for pretty strong evidence to convince us that a judicial discretion can exist, independently of the right or power of exercising it. Certainly, the cases put to illustrate this nondescript discretion, appear to be either those in which there is no discretion at all, or those which plainly are not the subject of review by a superior tribunal. Take, for instance, the case supposed, " where a court refuses to a party the benefit of an established rule of practice, not depending at all upon circumstances." The argument for granting a mandamus in such a case is founded on the assumption, that the court " had parted with its discretion, and substituted in its place a clear and well defined rule." Now, without determining that this assumption is right or wrong, it is evident that the argument rests wholly upon it; and therefore the case put is confessedly one where there was no discretion to be exercised. The other instance where the inferior court should refuse a new trial after a verdict against evidence, clear, satisfactory and all upon one side, though an extreme case, is still, I apprehend, a case where a mandamus could not properly be allowed. That every court, having the power to grant new trials, is to exercise its own discretion upon the application made to it, is, as a general proposition, not to be controverted. This discretion, however, undoubtedly to some extent, is regulated by usage, or if the term is preferred, by fixed principles. But by this is to be understood nothing more than that the same court cannot, consistently with its own dignity, and with its character and duty of administering impartial justice, decide different ways two cases in every respect acknowledgedly alike; and judges, upon whom such a practice could be established, would be obnoxious both to public censure and to public punishment. But the fact, whether the two cases are exactly alike in every color, circumstance and feature, is of necessity to be submitted to the judgment of some tribunal ; and the question therefore recurs, to what tribunal have the laws or institutions of the community submitted it? That a court ought to grant a new trial, where the verdict has been given against clear, explicit and uncontradicted evidence, is not as a principle of natural justice, to be denied. But if the supreme

### The Judges of the Oneida Common Pleas v. The People.

court, in such a case arising in it, should refuse to do so, the party aggrieved surely would have no redress, notwithstanding that in the case immediately preceding his own, the same court had set aside a verdict where the evidence to support it was conflicting and nearly balanced; and the reason why such a party should be remediless, arises out of the inexorable necessity of submitting every controversy ultimately to the arbitrary discretion of some tribunal. Allow the complaining party to carry his case from tribunal to tribunal, from the lowest to the highest; let him pursue justice through every avenue of the law, ascending finally to her most elevated seats, he must at last abide " the doubtful issue of misconstrued laws," and perchance be obliged to submit in silence to a decision utterly repugnant to his own perceptions of right.

The inquiry which we are pursuing is, whether in regard to the matter of a new trial, the law does not confide the like arbitrary discretion in a court of common pleas that it does in the supreme court; if it does, then considerations of the possible injustice that may be done by the misuse of this discretion are not to be entertained. The legal history of the power to grant new trials in the common pleas, independently of the fitness of things, would seem to justify the conclusion that it does. Formerly there was no power of granting a new trial in this court, and if the jury saw fit to render a verdict against evidence, though the evidence was " clear, uncontradicted and all upon one side," yet the party injured could obtain no relief. It was a case which even a mandamus, with all its modern powers, could not reach. The reason was, that the law preferred the jury to the judges as its depository of arbitrary discretion in regard to matters of fact. Afterwards the law gave to the court the power of granting a new trial, provided a judge of the degree of counsellor of the supreme court was present at the first trial; and finally, by the Revised Statutes, (*vol.* 2, *p.* 208, § 1), among other powers given to courts of common pleas, is that " to grant new trials." This power is unqualified in its terms; and it seems to be a [102] fair inference, that the statute intends to confer upon the judges and jury together, as unlimited a discretion in the final determination of matters of fact, as was formerly possessed by the jury alone.

The fourth proposition is, " that in all cases where a court is bound to proceed according to established legal principles, and it is alleged that an error has been committed, the supreme court has power to issue a mandamus; and if error has intervened, the same obligation exists to issue the writ as to affirm or reverse a judgment upon a return to a writ of error." This proposition is either only a reiteration of the first proposition in different language, or it is intended as an affirmation, that a mandamus will lie to inferior courts in all cases where a writ of error will not. In the latter aspect, the proposition is so opposed to principle and authority, that I will not presume that the court intended to maintain it. Viewed in the other aspect, it may be proper to add, to what has already been said, only, that where the action of the court is prescribed " by established legal principles," it is not a case of legal discretion, but of legal necessity, and can only occur where questions of law and not questions of fact are involved. It is not, therefore, like an application for a new trial, where facts are first to be ascertained, and by the same tribunal, before the question on the law, or rule of practice, applicable to the state of facts established, occurs; and here, it seems to me, is where the supreme court first departs from the true principle. It assumes to itself the ascertainment of the facts, and then upon its own judgment of the facts, it requires the inferior court to apply " the established legal principle." In short, it proposes to exercise the same review over the decision of the inferior court that it does over the verdict of a jury in its own court; for though they admit " it should be an extreme case in which a mandamus ought to be issued to compel an inferior court to grant a new trial," yet, by assuming to themselves the power of determining what is, and what is not an extreme case, they in effect subject every verdict in the inferior courts to their review.

[103]    This is a power which no single court, however numerous and diligent and learned its members may be, could successfully fulfil; and the impracticability of discharging such duties is, of itself, no light reason for concluding that they are not contemplated by the constitution or laws.    No better commentary on an attempt to exercise this power need be asked than that furnished by the court itself, *Ex parte Bailey*, (2 *Cowen*, 479,) where it says, " A contrary course [than to refuse a mandamus] would draw before this court an examination of those questions which address themselves merely to the discretion of the inferior court.    We should be perpetually appealed to for the adjustment of rights undefined by law.    This would result in an endless conflict of opinion upon questions which must, from their very nature, be finally determined by the courts below; because they cannot be reached by the rules of law."    If the soundness of these views, and the just apprehensions they express, require the confirmation of experience, it can be furnished abundantly since the court first departed from the course which they were put forth to vindicate.    Its calendars crowded with applications for mandamus ; its judges oppressed with the investigation of doubtful facts ; its channels of justice choked up with petty litigations : all plead eloquently against a decision which has gone far to make that court a court of appeal from all decisions of fact, as well as law, that are made in the inferior tribunals of the state.

Another and not less forcible argument of the inconveniences and mischiefs of this practice, arises from its effects upon this court of last resort.    A court acknowledgedly not instituted for the investigation and decision of controverted facts, but for the review and final determination of questions of law.    Yet it will be seen that under the statute regulating proceedings upon mandamus, every controversy arising in the supreme court upon such a writ, however trivial, whether of fact or of law, can be brought here ; thereby subjecting the discretion of that court, when exercised in reviewing the discretion of an inferior court, to a review, of which it is confessedly exempt when exercised [104]    in respect to questions originating in its own proceedings, though of transcendently greater moment.    Therefore, under this system, newly adopted by the supreme court, and which we are now called on to sanction, this court is exposed and is almost sure to be flooded with paltry questions of common pleas practice, involving facts difficult to be extricated from the masses of evidence in which they are buried, and when they are extricated and decided upon, settling no rule of law for the government of future cases, and scarcely settling, satisfactorily, the rule of right for the particular case in which they occur.

In concluding this long and, I fear, tedious examination into the nature of the writ of mandamus and the powers of a superior court to grant it, I am brought irresistibly to the opinion, that in the case to which I have so much referred and upon which I have so freely commented, *The People* v. *Superior Court of New York*, (5 *Wendell*, 114, *et.* 10 *id.*, 285,) the supreme court in granting a mandamus to vacate the rule of the court below for a new trial, extended the writ beyond its legitimate limits, as those limits have been defined and recognized by the court of king's bench, by the supreme court of the United States, by the courts of our sister states, and even by its own earlier decisions.

If this conclusion be right, it seems to follow inevitably, that the court had no jurisdiction by mandamus in the present case,    Here the question submitted to the determination of the inferior court, is, by the very language of the law, (2 *R. S.*, 653, § 8,) declared to be a question of fact, the fact whether the title to land came in question on the trial, a fact which did occur in the court below, and could occur nowhere else.    Whether we construe the statute to intend that the title must be brought into question *necessarily* on the trial or not, is indifferent for the purpose of ascertaining to what tribunal the statute confides the duty of deciding the fact.    It cannot be maintained that it contemplates having the decision of such a fact carried from the tribunal where alone it could

The Judges of the Oneida Common Pleas *v.* The People.

be certainly known, to another which can know nothing of it, except upon evidence inaccurately taken and certified by the inferior tribunal; for such a conclusion involves the necessity of attributing to the legislature [105] the absurd notion that the capacity of our judicial tribunals to determine facts, increases as their means for ascertaining them diminish. If in this case the court of common pleas did not know whether the title to land came in question on a trial in their presence, it is difficult to comprehend how the supreme court, not present, could better know it. Less than an express statutory direction cannot satisfy me that the law contemplates that the final decision of such a question should be taken from the court where the fact did occur, and referred to another tribunal where it did not occur, and which necessarily must possess very inferior means for arriving at the truth. The theory which would support a mandamus in this case, should authorize one to review the verdict of a jury, or any other decision upon evidence, made by an inferior tribunal. It must be also admitted, and indeed, it is admitted, that if a mandamus will lie to vacate the entry in the minutes of the court below in the present case, it would, consequently, lie to compel the court in another case, to make an entry that the title to land came in question on the trial, however repugnant such an entry might be to the court's knowledge of the fact. Either view presents the case of one court compelling another to decide a fact contrary to the dictates of its own conscience and judgment. It would seem to be a sufficient argument against the claim of such a power, that it would be morally impossible to enforce it.

But if a further reason be sought for concluding that a superior tribunal should not attempt by mandamus, to compel an inferior tribunal to certify to be true what it may know to be false, it will be found in our statute regulating proceedings on this writ. 2 *R. S.*, 587, § 57, in substance, declares that if a verdict shall be found for the relator, or if judgment shall be given for him upon demurrer or by default, he shall recover damages and costs. Thus, in the present case, the judges of Oneida common pleas having returned to the alternative mandamus the reasons why they caused the certificate to be entered in their minutes, that the title to lands came in question on the trial, have thereby made themselves liable to damages as well as costs, because they made [106] the return of the facts instead of vacating the certificate the moment the alternative mandamus reached them. If, therefore, a mandamus lies to regulate and control the discretion of an inferior court in such a case, it follows that the only safe course for the judges to pursue to avoid the chance of being mulcted in damages and costs in a business in which they have no interest, is to conform their proceedings to the wishes of the relator on the first intimation of his design to apply for a mandamus. But even this is not all their hazard; for in addition to damages and costs which they may be subjected to for the misfortune of not knowing what facts they witnessed as well as others who were not present know them, they are by the 60th section of the statute, made liable to a fine not exceeding two hundred and fifty dollars, if, in the opinion of their superiors, they have unreasonably delayed to stultify themselves.

In order then to sustain the present judgment of the supreme court, we have to conclude that that court has power by mandamus, to coerce the judges of a court of common pleas to certify a fact to be exactly the reverse of what their own judgment and knowledge instruct them that it is; and also the power to superadd to costs and damages, a fine for their tardiness and reluctance to deny truth and violate conscience. It is scarcely necessary to say that this is too monstrous a conclusion to receive my sanction.

On the question being put, *Shall this judgment be reversed?* all the members of the court (22 being present) voted in the affirmative.

Whereupon the following resolution was *unanimously* adopted:

"Resolved, That in this case the supreme court had no jurisdiction by *manda-*

Wood v. Jackson.

*mus* to review the decision of the court below, certifying that the title to land came in question on the trial."

The following is the judgment entered in this cause:

[107]　　Counsel having been heard, it is declared and adjudged that the supreme court had not jurisdiction and authority to award a mandamus in this case; and that the answer of the plaintiffs in error to the writ of alternative mandamus, was sufficient to bar or preclude the relator, Eli Savage, from having and obtaining the people's writ of peremptory mandamus against the judges of the court of common pleas of the county of Oneida. It is, therefore, further ordered and adjudged that the judgment of the supreme court in this cause be *reversed*, and that the people's writ of peremptory mandamus be denied, and that the said judges go thereof without day, &c. And it is further ordered and adjudged, that the said judges, the plaintiffs in error, recover against the said Eli Savage, the relator, the costs in this court and in the supreme court to be taxed; and that the record and proceedings be remitted, &c.